**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (pro hac vice)
Laurence M. Rosen (pro hac vice)
Christopher S. Hinton, #4113213
275 Madison Avenue, 34th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: chinton@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Lead Counsel for Lead Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| VINCE VALENTINO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br>v.<br>KPMG, LLP, JOHN J. AESOPH, AND DARREN M. BENNETT;<br><br>Defendants. | Civil Action No. 8:13-cv-00022<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Vincent Valentino, Raoul and Sharon Turcot and Eric Follestad (collectively the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, *inter alia*: (a) review and analysis of relevant filings made by TierOne Corporation ("TierOne" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of TierOne's public documents, conference calls

and press releases; (c) review and analysis of regulatory information and proceedings concerning Defendants and TierOne; (d) information readily obtainable on the Internet; and (e) interviews of several witnesses with personal knowledge of the relevant facts.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities other than Defendants who purchased the common stock of TierOne between March 13, 2009 and April 26, 2010, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws (the "Class").

2. Non-Party TierOne was a bank holding company. TierOne conducted its principal business through its wholly owned banking subsidiary, TierOne Bank (the "Bank"). Founded in 1907, the Bank became one of the largest banks in Nebraska. While it survived the Great Depression and numerous recessions, the Bank could not overcome its systemic lack of internal controls and false financial reporting which caused the Bank's failure—the largest Bank failure ever in Nebraska.

3. At the start of the Class Period, TierOne's auditor, KPMG, issued a materially false and misleading "clean" audit report for TierOne's fiscal year ended December 31, 2008 financial statements (the "Audit Report").

4. The Audit Report falsely stated that KPMG had conducted its audit of TierOne's year end 2008 results "in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

5. As to TierOne's internal controls, KPMG falsely stated that it audited "in accordance with the standards of the Public Company Accounting Oversight Board (United States), TierOne Corporation's internal controls over financial reporting as of December 31, 2008…. and our report dated March 12, 2009 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting."

6. In reality, however, Defendants knowingly turned a blind eye and deliberately disregarded numerous red flags and audit procedures Defendants identified as having to be completed relating to the quality of the TierOne's loan portfolio.

7. When the truth about the Audit Report entered the market through piecemeal disclosures and materialized, the value of TierOne stock fell—causing Plaintiffs and the Class substantial damages.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

11. In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including

but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12. Court-appointed lead plaintiffs Vincent Valentino, Raoul and Sharon Turcot and Eric Follestad purchased TierOne common stock during the Class Period and have suffered damages as a result. Lead Plaintiffs' certifications were previously filed with the Court, and are incorporated herein by reference.

13. Defendant KPMG is a limited liability partnership headquartered in New York County, New York. KPMG has offices in Omaha and in Lincoln.

14. During the Class Period, KPMG audited TierOne's financial statements for the fiscal year ended December 31, 2008 (the "2008 Audit"). KPMG also performed quarterly reviews of TierOne's financial statements during the Class Period.

15. KPMG earned substantial fees from providing audit and tax services to TierOne. Upon information and belief, the TierOne engagement was a substantial portion of defendant John J. Aesoph's book of business.

16. The following table summarizes the fees collected by KPMG from 2002 through 2008 from TierOne.

| Year | Audit Fees | Audit-Related Fees | Tax fees | Total Fees |
|---|---|---|---|---|
| 2002 | $316,840 | $19,000 | $32,540 | $368,380 |
| 2003 | $126,677 | $26,600 | $66,300 | $219,577 |
| 2004 | $478,250 | $68,613 | $52,907 | $599,770 |
| 2005 | $306,250 | $19,832 | $30,586 | $356,668 |
| 2006 | $295,500 | $31,775 | $20,748 | $348,023 |
| 2007 | $320,600 | $220,468 | $62,298 | $603,366 |
| 2008 | $397,880 | $39,955 | $50,540 | $488,375 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| | $2,241,997 | $426,243 | $315,919 | $2,984,159 |

17. Defendant John J. Aesoph ("Aesoph") at all relevant times herein was an auditor at KPMG. Aesoph has been a partner at KPMG since 2005. Aesoph was on the TierOne audit engagement from 2002 through KPMG's resignation in April 2010. Aesoph is a resident of Omaha, Nebraska. For the Audit of TierOne's 2008 financial statements Aesoph was the KPMG's Engagement Partner.

18. As Engagement Partner, Aesoph was responsible for the audit engagement and its performance, for proper supervision for proper supervision of the work of the engagement team members and for compliance with PCAOB standards.

19. Aesoph sought and received the assistance of defendant Darren M. Bennett, in fulfilling his responsibilities as Engagement Partner.

20. Defendant Darren M. Bennett ("Bennett") at all relevant times herein was an auditor at KPMG since 2001. Bennett worked on the TierOne audit engagement from 2003 through KPMG's resignation in April 2010, with exception of one year. Bennett was the KPMG's Senior Manager for TierOne's 2008 audit.

21. Bennett contributed significantly to the planning of the audit, the design of tests of controls, and the design and implementation of substantive procedures. Bennett was also responsible for executing the audit, including directing the audit engagement team on how to conduct the audit. Bennett reviewed the audit work papers and was responsible for on-site supervision of the audit engagement team. Bennett also played a significant role in gathering and evaluating evidential matter to support the audit of TierOne's allowance for loan and lead losses

("ALLL"), and specifically the valuation of collateral underlying the bank's FAS 114 loans.[1] Bennett, like Aesoph, was responsible for compliance with PCAOB standards with respect to the supervisory responsibilities that were assigned to him.

22. Bennett and Aesoph are collectively referred to hereinafter as the "Individual Defendants."

23. KPMG is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

24. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to KPMG under *respondeat superior* and agency principles.

**RELEVANT NON-PARTY**

25. Nonparty TierOne was a Wisconsin corporation with its principal executive offices located at 1235 N Street, Lincoln, Nebraska 68508. The Bank was a federally chartered stock savings bank. During the Class Period, TierOne's stock was listed on the NASDAQ under ticker "TONE" until it was delisted on May 7, 2010. Thereafter, the Company's shares traded on the over-the-counter market. At all relevant times herein, the Bank's primary regulator was the U.S. Office of Thrift Supervision ("OTS").

26. Throughout the Class Period, TierOne misrepresented its true financial condition to investors. TierOne's financial statements were materially false and misleading because it underreported its loan loss reserves, i.e., ALLL and related Provision for Loan and Lease Losses (the

---

1 "FAS" stands for Financial Accounting Standards Board's Statement of Financial Accounting Standards. FAS No. 114 is entitled "Accounting by Creditors for Impairment of a Loan—and amendment of FAS No. 5 and 15." As used herein FAS 114 loans are loans are larger non-homogeneous loans (i.e., not care or residential mortgage loans), such as land and land

"Provision").[2] The Bank's ALLL consisted of two primary components, and allowance for loans impaired under FAS 114 and an allowance for FAS 5.

27. Throughout the Class Period, TierOne suffered from a host internal control deficiencies that directed impacted the accuracy of its SEC filings. Among other things, (1) the Bank failed to timely obtain appraisals for collateral on loans and even ignored such requests from its own loan review department; (2) the Bank failed to implement controls for loan quality or underwriting (3) the Board of Directors was passive and would not undertake difficult actions; (4) Senior management was in denial of the Bank's problems and rather than address the Bank's deficiencies wanted to wait until the economy improved; (5) the Bank was inappropriately rating loan risk; (6) the Bank failed to keep proper loan files; documentation routinely went missing; and (7) the Bank failed to provide regulators, including the OTS, adequate documentation about its loans.

28. On June 4, 2013, the OTS closed the Bank and the FDIC was named receiver. In connection with the Bank's closing, Great Western Bank, assumed the Bank's deposits and assets.

29. On June 24, 2010, TierOne filed a Chapter 7 Bankruptcy petition with the District of Nebraska Bankruptcy Court.

**A. WITNESSES**

---

development and residential construction loans.

2 ALLL and the related Provision are extremely material as it relates directly to the financial health of a bank. ALLL is a specified balance-sheet account held to fund potential losses on loans or leases. ALLL is a contra-asset account that is an offset to loans receivable. The related Provision is an expense item charged to a bank's earnings when adding to ALLL for the current period. The Provision is reported in the statement of operations (or income/loss statement). Therefore, any increases in the Provision, will generally decrease the net income (or increase net loss) for the period.

30. Bernal Quesada ("Quesada") was the 1st Vice President of the Bank's Internal Asset Review Office from December 2008 to February 2010. Prior to joining the Bank, he worked at various banks in roles progressing from Credit Review Specialist to Senior Vice President-Credit Review Manager. Quesada also worked as bank examiner for the U.S. Office of the Comptroller of Currency ("OCC") for approximately eight years. Quesada is currently employed at the FDIC.

31. According to Quesada:

(a) Prior to joining the Bank in December 2008, the Bank did not have an actual loan review department, even though prior to the real estate crash most other banks had loan review departments. Loan reviews had previously been performed by a few employees who were used primarily for other tasks such as collections. Those employees had been instructed by management to focus on other profitable tasks, and the oversight duties were overlooked.

(b) He was hired by the Bank in December 2008 to build a loan review department in connection with an OTS mandate. He stated that mandate was the result of the June 2008 OTS exam, which required all loans be reviewed by March 31, 2009. As a result of the OTS mandate, guidelines were also supposed to be established for how the bank handled the loan portfolio, ALLL, and loan underwriting. Bank management and the Board were charged with ensuring the quality of the loan portfolio was properly assessed and determining if the lending officers were assigning proper risk.

(c) Initially he was in the chain of command of CEO Lundstrom. He then reported to the Board of Directors and attended Board meetings. Every ninety days he was required to attend Board a meeting and report his findings and any concerns. Quesada observed that the Board was extremely passive and did not confront management. Based on his interaction with the Board, Quesada believed that the Board was very unwilling to undertake anything difficult.

(d) Shortly after he joined the Bank, he learned that the Bank was going to fail unless something changed drastically. It didn't. He determined that there was no accountability at the Bank. For example, loan officers were rewarded for making loans, but they never had to review the loans after they were made. He attributed problems at the Bank to senior management's denial of problems, a passive board, lack of accountability of loan officers, and the failure to implement controls for loan quality or underwriting.

(e) While he was at the Bank, the Bank did not believe a loan review department was necessary (as it did not generate profits), and Quesada felt that the Bank resented being required to hire him. Senior management believed that the problems at the Bank were simply due to a poor economy. According to Quesada, a person in charge, Chief Credit

Officer, Don Langford, never gave any importance to the loan review process. Quesada learned, among other things, that: (1) the Bank had not been rating loan risk appropriately and that the risk profiles were too high; and (2) the Bank could not provide evidence to the OTS that anyone at the Bank was actually reviewing the Bank's loans; what little review evidence that was provided to the OTS revealed that the quality of the reviews were extremely poor.

(f) As to Special Mention loans the Bank had actually worked or reworked some of those accounts when borrowers could not repay them. However, no financial analysis was done and the Bank could not provide evidence to regulators that the borrowers would be able to eventually repay the loans. When borrowers were interviewed for a potential workout agreement, the loan officers should have obtained current appraisals. This did not happen, even when additional financing was extended to borrowers. When regulators discovered this, they instructed the Bank to obtain valuations for the properties. Once the Bank eventually obtained some of the valuations, the values were significantly lower than the value the Bank had on the books.

(g) The Bank did not obtain timely appraisals for collateral on loans because Quesada believed that the Bank wanted to maintain the OTS mandated risk-based capital ratio of 11%. If the appraisals lowered the values of the underlying properties too much, it would have jeopardized compliance with the OTS requirement, and resulted in OTS enforcement proceedings. He learned that senior management was hopeful that the economy was going to recover, and that valuations would come back if they waited longer for the appraisals. Senior management was responsible for making the decision to hold back on appraisals.

(h) Quesada learned of an internal memorandum written by the head of the Bank's workout area that was provided to the OTS during one of the OTS examinations conducted during the time of Quesada's tenure at the Bank. This memorandum outlined numerous issues at the Bank, including, assertions that management of the Bank did not want to obtain appraisals on problem accounts. The head of the Bank's workout area was in a very important position to recommend how to minimize loan losses to senior management.

(i) When Quesada determined that a property required an updated appraisal, Quesada would communicate it to management, but nothing would happen.

(j) Also at the Bank, Quesada had difficulty getting anyone on the lending side to respond to his findings or concerns. The Chief Credit Officer took no interest in his work. He experienced this same frustration when trying to communicate his findings and concerns to all levels of management.

(k) While at the Bank, Quesada had direct contact with KPMG. KPMG indicated to Quesada it was in connection with KPMG's review of commercial loans. KPMG did not report back to Quesada about KPMG's findings if any.

(l) The OTS' October 2009 report of examination revealed the same findings about the Company's loan portfolio and internal controls that Quesada had been reporting to the Bank's management since he had joined the Bank. Among other things, the OTS indicated that: (1) the Bank's files contained no financial analysis proving that borrowers had the ability to pay the loans; (2) the Bank's lending officers had failed to update files or obtain any recent valuations; and (3) OTS took issues with the few valuations that had been obtained.

(m) From the OTS examinations that were conducted while he was at the Bank, Quesada learned that the FDIC and OTS "had no confidence of what was being reported [by the Bank]."

(n) Quesada spent approximately 8 years as a bank examiner with the OCC. According to Quesada, the OCC categorized bank management as one of three types once regulators get involved: (1) executives who believed there was a problem; (2) executives who were starting to recognize the bank had some issues; and (3) executives who accepted there were problems and tried to resolve the issues. Quesada stated that throughout his tenure at the Bank, TierOne executives were always in denial.

32. Confidential Witness No. 1 ("CW1") was a Vice President in the Bank's Lending Department from 2007 to September 2009. CW1's office was at all relevant times located at TierOne's main office location in Lincoln, NE. According to CW1:

(a) CW1's responsibilities were lending and servicing of corporate clients.

(b) In that role, CW1 did have some interaction with the OTS about the Bank.

(c) As to ALLL, CEO Lundstrom and COO Laphen participated in regular meetings to discuss loans that were about to go bad or were bad, with CW1's supervisors, which included Gale Furnas.

(d) Loans generated by the Bank's loan production office, *i.e.* loans that paid commission to the person generating the loan, did not go through a loan review process. Such loans could be approved by senior management without going through any loan review. CW1 learned of a person from the loan production office who was paid over $1 million in commissions, because he was "booking loans like crazy."

(e) CW1 reported to management that loan file maintenance was poor. CW1 indicated that when loan documents were sent to be filed, and later retrieved by CW1 or others, that the retrieved loan files would be missing documents that the file previously did not.

(f) Based upon CW1's tenure and interaction with management, CW1 determined that TierOne never timely disclosed the true nature of the Bank's deteriorating loan portfolio. CW1 believes that the delay by the Company in issuing its financial statements was to "manipulate" the numbers to make the Bank look to investors in better financial condition that it actually was.

## SUBSTANTIVE ALLEGATIONS

### KPMG Issues the Clean Audit Report

33. The Class Period begins on March 13, 2009 when TierOne filed its Form 10-K with the SEC for the fiscal year ended December 31, 2008. Accompanying the 10-K was KPMG's materially false and misleading clean Audit Report of TierOne's 2008 financial statements and TierOne's internal controls.

34. The Audit Report falsely states that KPMG conducted its audit of TierOne's 2008 financial statements in "accordance with the standards of the Public Company Accounting Oversight Board (United States)." The standards of the Public Company Accounting Oversight Board or "PCAOB" were formerly referred to as GAAS or Generally Accepted Auditing Standards. The Audit Report states in relevant part:

> **Report of Independent Registered Public Accounting Firm**
> The Board of Directors and Stockholders
> TierOne Corporation:
>
> * * *
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> * * *
>
> We also have audited, in accordance with the standards of the Public Company

> Accounting Oversight Board (United States), the consolidated statements of financial condition of TierOne Corporation as of December 31, 2008 and 2007, and the related consolidated statements of operations, changes in stockholders' equity and comprehensive income (loss), and cash flows for each of the years in the three-year period ended December 31, 2008, and our report dated March 12, 2009 expressed an unqualified opinion on those consolidated financial statements.
>
> /s/ KPMG LLP
> Lincoln, Nebraska
> March 12, 2009

35. As to TierOne's internal controls KPMG falsely stated that TierOne's internal controls were effective. The Audit Report provides in relevant part:

> …. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.
>
> * * *
>
> In our opinion, TierOne Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control - Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

**Prior to the 2008 Audit, Defendants Were Aware of Issues Relating to the Accuracy of TierOne's 2008 Financial Statements and Internal Controls**

<u>TierOne's Regulator Identified Significant Deficiencies Relating to TierOne's ALLL</u>

36. Throughout 2008, TierOne was experiencing a dramatic increase in high-risk problem loans, which were deemed to be "impaired," meaning that it was probable the Bank would not be able to recover all amounts due under those loans. According to TierOne's 2008 10-K, "Impaired

loans totaled $185.9 million at December 31, 2008, an increase of $60 million, or 47.6%, compared to $52.5 million at December 31, 2007."

37. According to the "OTS Audit Report," entitled *Safety and Soundness: Material Loss Review of Tier One Bank*, dated July 12, 2011, the OTS conducted two examinations of TierOne in 2008, on April 28, 2008 and on June 2, 2008. A copy of the OTS Audit Report is attached hereto as Exhibit 1 and is incorporated herein by reference.

38. The April 2008 OTS examination was a limited scope examination which revealed that the Bank's Capital, Asset Quality, Management, Earnings, Liquidity and Sensitivity to Market Risk ("CAMELS") had decreased to an overall rating to 3—a poor rating, from a prior rating from a good rating from the OTS' February 2007 full-scope examination of the Bank. KPMG was aware of and had access to the results of the April 2008 OTS examination prior to and during the conduct of the 2008 Audit. Indeed, the OTS examination reports were included in KPMG's work papers for the 2008 Audit.

39. The June 2008 OTS examination resulted in a CAMELS rating of 4, which called for a number of corrective actions at the Bank. KPMG was aware of and had access to the results of the June 2008 OTS examination prior to and during the conduct of the 2008 Audit. Indeed, this examination report was included in KPMG's audit work papers for the 2008 Audit.

40. As evidenced by the Supervisory Agreement, dated January 15, 2009, OTS Docket No. 03309, the June 2008 OTS examination identified numerous material internal control deficiencies relating to the Bank's financial reporting including, but not limited to, requiring the Bank:

(a) by November 30, 2008, to "adopt a system of internal controls to verify that management is timely recognizing losses on impaired loans in accordance with SFAS 114 and

submit documentation of the implementation of such a system to OTS";

(b) to adopt a new Internal Asset Review Program for its loan portfolio by December 31, 2008;

(c) to address "underwriting and administration deficiencies" by December 31, 2008, covering, among other things, "[e]stablishment of procedures that require current and well-supported appraisals on applicable loans"; and

(d) management to review 50% of the Bank's non-homogeneous loan or loan relationship (i.e. FAS 114 loans as used herein) exceeding $1 million by January 31, 2009 and the remainder completed by March 31, 2009.

41. The Supervisory Agreement, which KPMG was aware of and was available to KPMG during its 2008 Audit, identified numerous other internal control issues related to the Bank's loan portfolio which put Defendants on notice. A copy of the Supervisory Agreement is attached hereto as Exhibit 2, and is incorporated herein by reference.

42. Defendants were also aware of and had access to Quesada prior to and during the 2008 Audit, given that Quesada was TierOne's loan review department. Indeed, as noted above, Quesada had direct contact with KPMG in connection with KPMG's review of commercial loans at the Bank.

43. KPMG either deliberately disregarded the numerous concerns outlined by Quesada as noted above, or failed to investigate further with Quesada—the Bank's loan review department. Had KPMG done considered Quesada's concerns, it could not have issued the clean Audit Report it did.

44. Consistent with Quesada's testimony, the OTS Audit Report revealed that in 2008 TierOne's own internal auditors found that TierOne's management failed to order updated appraisals when modifying loan, and that TierOne management failed to take corrective action until prompted

by regulators in 2009. The OTS Audit Report states in relevant part:

> TierOne's management often failed to order updated appraisals when modifying loans or when material deterioration in property values was evident. In many instances, the original appraisal report was over 2 years old. OTS and TierOne's internal auditors identified this issue in 2008 but TierOne management took no corrective action to improve the appraisal practices until prompted again by OTS examiners during the 2009 examination. After obtaining updated appraisals, TierOne management recorded $120 million in loan loss provisions and $10.8 million in other real estate owned (OREO) write-downs.

45. During KPMG's 2008 Audit of TierOne, Defendants had access to and were aware of TierOne's internal auditors' findings in this regard.

KPMG's Audit Plan Identified ALLL and the Loan Portfolio as an Area Presenting Significant Risk of Misstatement; Aesoph and Bennett Were Aware of the Risks

46. In addition to the facts alleged above, KMPG's internal documents specifically identified that TierOne's deteriorating and problem loan portfolio posed a significant and material misstatement risk.

47. According to the SEC's regulatory action against defendants Aesoph and Bennett entitled *In re John J. Aesoph, CPA and Darren M. Bennett, CPA*, No. 3-15168 (the "SEC Action"), KPMG's audit planning document—reviewed and approved by both defendants Aesoph and Bennett—identified the bank's ALLL's as a risk that could results in a material misstatement in TierOne's financial statements. "Specifically, the audit plan noted that the ALLL presented a significant risk of material misstatement, both with respect to inherent risks and control risk, including risk of fraud." A copy of the SEC Action is attached hereto as Exhibit 3.

48. According to the SEC Action, both Aesoph and Bennett were aware of the following red flags that should have, under PCAOB standards, triggered Aesoph and Bennett's professional skepticism and lead them to investigate further. Had they investigated these red flags further, KPMG could not have issued the clean 2008 Audit Report it did.

(a) As part of the June 2008 examination, the OTS identified a deficiency in TierOne's ALLL as of March 31, 2008 between $17 and $22 million, a 25% increase from previously reported ALLL. Aesoph and Bennett were aware of this deficiency, as Bennett directly identified it in a memo he wrote, that Aesoph reviewed.

(b) Third-party market data in regions where collateral underlying the Bank's AS 114 loans were located (i.e., Las Vegas, Nevada, and Phoenix) showed significant declines in real estate value, but TierOne's adjustments on collateral underlying the Bank's AS 114 loans were inconsistent. For example, the Bank prepared spreadsheets analyzing more than fifty borrower relationships totaling $255 million in loans for impairment under AS 114. Approximately $186 million of these loans were actually deemed impaired by the Bank. The majority of the loans the bank evaluated for impairment under AS 114 were collateralized by proper with appraisals older than a year—yet over half of these stale appraisals were not discounted. Yet on the stale appraisals that were discounted, "those discounts were typically inconsistent with—and more favorable to the bank than- the declines indicated by independent market data."

(c) Corroborating Quesada, and the OTS Audit Report, "TierOne Management often did not get updated appraisals on the collateral underlying the bank's FAS 114 loans. This failure came despite the fact that the OTS and members of the audit engagement team noted stale appraisals and recommended that appraisals be updated."

(d) In the limited instances where new appraisals were obtained the "[a]ppraisals received throughout 2008 showed that management's estimates were inflated by twenty to almost fifty percent in the prior quarter. The magnitude of the quarter-to-quarter declines could not be explained by market conditions alone. In addition to the updated appraisals showing differences in value from the immediately-preceding quarter, some of those appraisals revealed tremendous drops

in the value TierOne had used at year end 2007." These sharp declines, and management's reluctance to obtain new appraisals was a red flag.

(e) During the 2008 Audit, KPMG reviewed a memorandum prepared by TierOne and annotated by KPMG's audit engagement team that assessed the adequacy of the fourth quarter 2008 ALLL balance. The document stated that for Nevada land and residential construction loans, TierOne "tries to estimate collateral value declines in real estate by discounting appraised values, which are older than six months." "Despite this stated policy, TierOne often failed to discount Nevada appraisals that were more than six months old."

(f) TierOne's unallocated reserve which was intended to cover loan losses inherent in TierOne's loan portfolio, including loans in Nevada, actually decreased from approximately $7 million in the second and third quarters to approximately $4 million at year end. Given market conditions continued to deteriorate throughout 2008, the unallocated reserve should have been increasing in size--not decreasing. "This decrease was particularly troubling given that during its year end audit, the audit engagement team relied on the unallocated reserve to absorb potential errors in TierOne's calculation of its ALLL or to justify not performing additional audit work." According to the SEC Action, "[t]hese conclusions by the audit engagement team were reviewed by Aesoph and Bennett."

(g) In violation of GAAP,[3] in connection with the valuations of the Bank's DAS 114 loans provided to KPMG, TierOne did not document the rationale and basis for management's assumptions regarding the valuation of collateral underlying the bank's FAS 114 loans.

49. At the conclusion of the 2008 Audit, both Aesoph and Bennett falsely signed off, stating that "all necessary auditing procedures were completed," that "support for conclusions was

obtained," and that "sufficient appropriate audit evidence was obtained."

50. Aesoph also falsely signed off on the audit checklist's requirement that the audit engagement team had "performed and documented its work in compliance with … applicable auditing standard …, and the working papers demonstrate this compliance."

**Contrary to the Audit Report, the 2008 Audit Was Not Conducted in Accordance with the "standards of the Public Company Accounting Oversight Board [PCAOB]"**

Applicable PCAOB Standards Relating to the Audit of Internal Controls

51. In an integrated audit, such as the one at issue here, an auditor should design tests of controls to obtain sufficient evidence both to support his or her opinion on intimal control over financial reporting and to support his or her control risk assessments for the purpose of the audit of the financial statements. AS No. 5, ¶7.

52. Auditors also should determine and understand the likely sources of potential misstatements. One of the ways to do so is "by asking himself or herself 'what could go wrong?' within a given significant account or disclosure." AS No. 5, ¶¶ 28-31.

53. To further understand the likely sources of potential misstatements, and as part of selecting the controls to test, the auditor should understand the flow of transactions related to the relevant assertions, identify points within the company's processes at which a misstatement could arise that would be material, and identify the controls that management has implemented to address these potential misstatements. AS No. 5, ¶ 34.

54. Performing a "walkthrough" is often the most effective way to understand likely sources of potential misstatements and identify the appropriate controls to test. AS No. 5, ¶ 37.

55. Walkthroughs require the auditor to "follow[] a transaction from origination through

---

3 *See* Financial Reporting Release No. 28, and Staff Accounting Bulletin No. 102.

the company's processes ... until it is reflected in the company's financial records, using the same documents and information technology that company personnel use." AS No. 5, ¶ 37.

56. The selection of the controls to test, and the evidence needed to evaluate a given control, are driven by the auditors 'risk assessment.' AS No. 5, ¶ 10. "The auditor should focus more of his or her attention on the areas of highest risk," taking into consideration the risks such as the risk of fraud with respect to significant management estimates. AS No. 5, ¶¶ 11, 14.

57. The level of evidence needed increases as the risk associated with the control increases. AS No. 5, ¶¶ 46-47.

58. Some types of tests, by their nature, produce greater evidence of the effectiveness of controls than other tests. AS No. 5, ¶ 50. PCAOB standards include a hierarchy of tests. Inquiry, which ordinarily produces the lowest level of evidence, is never alone sufficient to support a conclusion about the effectiveness of a control. AS No. 5, ¶¶ 45, 50.

59. If there are deficiencies in a company's internal control over financial reporting that, individually or in combination, result in one or more material weaknesses, the auditor "must express an adverse opinion on the company's internal control over financial reporting, unless there is a restriction on the scope of the engagement." AS No. 5, ¶ 90.

<u>The Audit of TierOne's Internal Controls Did not Comply with PCAOB Standards</u>

60. Aesoph and Bennett both reviewed and approved key audit work papers involving the evaluation and testing of TierOne's internal controls over the ALLL.

61. According to the SEC Action, KPMG's audit of TierOne's internal controls did not comply with the foregoing PCAOB standards for the following reasons:

(a) AS No. 5 required Defendants to understand likely sources of potential misstatements and focus on areas of highest risk—the audit engagement team identified the ALLL control which

was the Bank's Asset Classification Committee. The Bank's Asset Classification Committee did not effectively address the riskiest component of ALLL, the Bank's valuation of collateral for AS 114 loans with stale appraisals. The Asset Classification Committee was not an effective control over the valuation of collateral underlying the Bank's FAS 114 loans because the "Committee did not generate or review written documentation to support TierOne's calculations, including, specifically, documentation of the rationale and basis for management's assumptions regarding valuation of collateral. Without such documentation, there was insufficient evidence upon which to conclude that the bank's internal controls related to valuation of collateral were effective."

(b) The SEC Action also noted that the "the 'walkthrough' described in the audit work papers, which was specifically reviewed by Bennett, was insufficient to provide a sufficient understanding of the valuation process or to identify important points at which a necessary control in the process was missing or was not designed effectively."

(c) Defendants failed to identify or test any effective internal controls to determine whether TierOne was complying with its own policies for updating appraisals, and further lacked a reasonable basis for conclusion that there were no material weakness in TierOne's internal control over financial reporting. TierOne's written lending policy required that all loans be supported by "current appraisals or evaluations." The policy also states "[i]n a rapidly escalating or deteriorating market, a value may be invalid when a loan was renewed, extended, or refinanced if market deterioration indicated that the collateral may no longer fully protect the loan." This written loan policy was not in and of itself a control, and that the "auditors failed to identify any control to ensure compliance with this policy. In fact, TierOne frequently ignored or violated this policy, continuing to rely on stale appraisals in significantly deteriorated markets. TierOne also failed to obtain new appraisals on loans that had been modified."

Applicable PCAOB Standards Relating to the Audit of Financial Statements

62. TierOne's calculation of the appropriate loss reserve on the Bank's AS 114 loans, which was based largely on an assessment of the value of the underlying collateral, was an estimate. As such, the auditors' responsibility was to obtain sufficient competent evidence to provide reasonable assurance that the estimates were reasonable and presented in conformity with the relevant accounting principles. AU §§ 328, ¶3; 342, ¶ 7.

63. In evaluating reasonableness, the auditor should obtain an understanding of how management developed the estimate. Based on that understanding, the auditor should use one or a combination of the following approaches: (1) review and test the process used by management to develop the estimate; (2) develop an independent expectation of the estimate to corroborate the reasonableness of management's estimate; or (3) review subsequent events or transactions occurring prior to the date of the auditor's report. AU § 342, ¶ 10; *see also* AU 328, ¶ 23.

64. Where management's estimate is based on a valuation, such as an appraisal, that was made prior to the financial reporting date, the following is an example of a consideration in the development of audit procedures: "obtain[ing] evidence that management has taken into account the effect of events, transactions, and changes in circumstances occurring between the date of the fair value measurement and the reporting date." AU § 328, ¶ 25; *see also* AU § 313, ¶ 3 ("Applying principal substantive tests to the details of an asset or liability account as of an interim date rather than as of the balance-sheet date potentially increases the risk that misstatements that may exist at the balance-sheet date will not be detected by the auditor "), ¶6 ("The auditor should consider whether there are rapidly changing business conditions or circumstances that might predispose management to misstate financial statements in the remaining period. If such conditions or

circumstances are present, the auditor might conclude that the substantive tests to cover the remaining period would not be effective in controlling the incremental audit risk associated with them. In those situations, the asset and liability accounts affected should ordinarily be examined as of the balance-sheet date.”).

65. Importantly, because estimates were involved, the auditors were required to be particularly attuned to management bias - intentional or not. Among other things, auditors normally should consider “the historical experience of the entity in making past estimates.” AU§ 342, ¶ 9. ‘‘Even when management’s estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors. Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors” management used in making the estimates. AU § 342, ¶ 4.

66. Further, as the auditors had correctly identified TierOne’s ALLL as presenting a risk of fraud and a high risk of error, the auditors had a heightened responsibility over this area. AU § 312, ¶17 (“Higher risk may cause the auditor to expand the extent of procedures applied, apply procedures closer to or as of year end, particularly in critical audit areas, or modify the nature of procedures to obtain more persuasive evidence.”); AU § 316, ¶ 2 (“[T]he auditor’s response to the risks of material misstatement due to fraud involves the application of professional skepticism when gathering and evaluating audit evidence.”).

> Because of the characteristics of fraud, the auditor’s exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor’s belief about management’s honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of

> whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest.

AU§ 316, ¶13.

67. The risk of material misstatement generally increases where, as here, the relevant account is an estimate. AU § 312, ¶36. While estimates may differ, an unreasonable estimate should be considered a likely misstatement. AU § 312, ¶36. The auditor should also consider whether differences in management's estimates and estimates best supported by the audit evidence suggest possible management bias. AU§ 312, ¶ 36.

68. While representations from management are a part of the audit evidence, ''they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333, ¶2.

69. This is particularly true in an area, like the ALLL, involving estimates. AU § 316, ¶ 54 ("In addressing an identified risk of material misstatement due to fraud involving accounting estimates, the auditor may want to supplement the audit evidence otherwise obtained .. .. "). It is even more critical where the audit area involves a risk of fraud. AU § 316, ¶ 46 ("Examples of the application of professional skepticism in response to the risks of material misstatement due to fraud are .. . obtaining additional corroboration of management's explanations or representations concerning material matters, such as through third-party confirmation, the use of a specialist, analytical procedures, examination of documentation from independent sources, or inquiries of others within or outside the entity."); AU 316 ¶ 53 (example of modification of procedures in response to identified risks of material misstatement due to fraud include "[i]nterviewing personnel involved in activities in areas where a risk of material misstatement due to fraud has been identified

to obtain their insights about the risk and how controls address the risk"); AU §326, ¶ 21 (''When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity .. .. The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly.").

70. The auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. AU § 326, ¶ 25; *see also id* ("In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements."). The inability to obtain sufficient competent evidential matter may require the auditor to qualify his or her opinion or to disclaim an opinion. *See* AU § 508, ¶ 22.

71. Finally, auditors are required to clearly document the work they perform. *See* AS No. 3. "Audit documentation should be prepared in sufficient detail to provide a clear understanding of its purpose, source, and the conclusions reached." AS No. 3, ¶ 4. ''The auditor must document the procedures performed, evidence obtained, and conclusions reached with respect to relevant financial statement assertions." AS No. 3, ¶6. "Audit documentation must clearly demonstrate that the work was in fact performed." AS No. 3, ¶6. ''Because audit documentation is the written record that provides the support for the representations in the auditor's report, it should," among other things, "[d]emonstrate that the engagement complies with the standards of the PCAOB." AS No. 3, ¶5.

<u>The Audit of TierOne's Financial Statements Did not Comply with PCAOB Standards</u>

72. According to the SEC Action, KPMG's audit of TierOne financial statements did not

comply with the foregoing PCAOB standards for the following reasons:

(a) In reviewing the reasonableness of management's estimates of the value of the collateral underlying the Bank's AS 114 loans--- one of the riskiest and most critical elements of the bank's AS 114loss estimate calculation. The audit engagement team relied principally on the most recent (and often stale) appraisals given them and on management's uncorroborated representations of current value. The audit engagement team relied on these representations despite evidence that management's estimates were biased and inconsistent with independent market data.

(b) Bennett was directly involved in the audit engagement team's AS 114 test work. Bennett initially reviewed the individual spreadsheets prepared by TierOne that purported to justify the valuation of the underlying collateral of the bank's AS 114 loans; Bennett supervised the audit test work and collection of evidential matter, including meeting directly with management to discuss management's estimates of the value of collateral; and Bennett approved the audit engagement team's AS 114 test work prior to passing it to Aesoph. Aesoph reviewed the AS 114 test work prior to signing the audit report. By failing to subject management's estimates to appropriate scrutiny, the auditors violated PCAOB standards, including particularly AU Sections 328 and 342, which address auditing fair value and accounting estimates, respectively. Specifically:

> (1) Aesoph and Bennett relied on an unsupported - and unsupportable – assumption that appraisals less than a year old were "current," without regard to the property's location or stage of development, and that market conditions had not materially deteriorated throughout the year. Many of the markets in which TierOne's collateral was located were seeing significant continuing quarterly declines in the value of real estate. In addition, many of the properties that served as collateral were under development and in varying stages of completion. TierOne's lending policy cautioned against relying on aged

appraisals in these markets. According to the policy, "[i]n a rapidly escalating or deteriorating market, a[n appraisal] value may be valid for only a few months." Despite this policy, Aesoph and Bennett arbitrarily assumed that only appraisals older than a year potentially needed adjusting.

(2) Aesoph and Bennett's assumption about appraisals up to a year old was unsupported by any evidence. For example, for the troubled Nevada market, there was an internal TierOne memorandum included in the audit work papers, and reviewed by Aesoph and Bennett, that "noted that the bank would estimate collateral for Nevada real estate by discounting appraisals older than six months, acknowledging that six month old appraisals in that market were not reflective of current market conditions. Even so, the bank failed to discount many Nevada appraisals that were more than six months old and Aesoph and Bennett failed to reconcile the inconsistency between the bank's stated practice and its actual practice."

(b) The test work on TierOne's management valuation estimates was insufficient as it relied only on TierOne management's representations—which is not sufficient evidence in a high risk audit area.

(c) "Auditors improperly relied on management's uncorroborated representations even though independent evidence indicated that management's estimating and discounting decisions were biased. As noted above, earlier in 2008, the OTS had determined that TierOne had underreported its ALLL by nearly 25%. And the few times TierOne obtained anew appraisal on an impaired loan throughout 2008, that new appraisal typically showed that TierOne's valuation in the immediately preceding quarter was seriously deficient. In addition, TierOne's discount decisions and amounts were often significantly different on properties in the same market, and were typically

inconsistent with third-party market information. Further, the rationale for TierOne's discounting decisions was not documented. Despite these red flags, the auditors continued to rely on management's representations regarding management's appraisal discounting decisions, without performing any additional test work or obtaining independent corroboration of management's representations."

(c) The auditors also failed to corroborate, additional information set forth in TierOne's AS 114 worksheets, which made references to other information in support of management's estimates of the fair value of collateral. The auditors failed to obtain independent corroboration for this information.

(d) PCAOB standards required Defendants to assess management bias. *See* AU § 342, ¶9; AU § 316, ¶64. During its 2008 Audit, KPMG noted that TierOne's ability to reliably develop significant estimates was adequate. However, as noted above both Aesoph and Bennett knew that the June 2008 OTS findings identified a deficiency in TierOne's ALLL that represented 25% of the ALL balance at the time. Aesoph and Bennett knew or recklessly disregarded, the rare instances where the bank actually obtained appraisals on impaired loans, resulted in significant declines in value of the collateral both compared to the previous quarter and in some cases compared to the values used in prior years. In many cases, these new appraisals resulted in significant increases in the loan loss provisions associated with these loans.

(e) PCAOB standards also requires an auditor to investigate facts discovered after the date of their audit report. *See* AU § 561. "When the auditor becomes aware of information which relates to financial statements previously reported on by him, but which was not known to him at the date of his report, and which is of such a nature and from such a source that he would have investigated it had it come to his attention during the course of his audit, he should, as soon as

practicable, undertake to determine whether the information is reliable and whether the facts existed at the date of his report." AU § 561, ¶4. If in fact the information is reliable and existed at the date of the report, other steps may be required. AU § 561, ¶¶ 5 - 8. ''Subsequent events affecting the realization of assets ... ordinarily will require adjustment of the financial statements ...." AU§ 560, ¶7.

(f) During KPMG's 2009 quarterly reviews, "the engagement team learned of several borrower relationships that had new appraisals or valuations that likely existed at the date of KPMG's 2008 audit report, issued on March 12, 2009. In each case, that new valuation showed a significant decline from management's estimate at year end."

(g) Even though Aesoph and Bennett learned that there were new appraisals and valuation assessments which were dated prior to the issuance of the 2008 audit report, the requisite procedures under AU§ 561 were not performed. Instead, Aesoph and Bennett assumed no investigation was required because they claim that they received representations from TierOne management shortly before issuing their audit opinion that no new appraisals had been received that impacted the 2008 financial statements. This explanations makes no sense, because this information should have AU§ 561: new information came to light after the audit report was issued that was inconsistent with previous information and, for that matter, management's purported representations that all new appraisals had been given to KPMG. Aesoph and Bennett had an obligation to investigate, but failed to do so.

<u>KPMG Admits the Audit Report Is False and Should Not Be Relied Upon</u>

73. On April 26, 2010 TierOne issued a press release announcing KPMG had orally informed the Company's Audit Committee that it has withdrawn its clean 2008 Audit Report on

TierOne's financial statements and internal controls as well as KPMG's review of the Company's first quarter ended March 31, 2009. The press release also states that "KPMG has orally indicated to the Company that hose financial statements contain misstatements and should not be relied upon by investors."

74. Additional detail was provided in an 8-K TierOne filed with the SEC filed on May 14, 2010. The 8-K states in relevant part:

> KPMG has advised the Company and the Company's Audit Committee orally that (1) it has withdrawn its audit opinion relating to the Company's financial statements at and for the year ended December 31, 2008 contained in the 2008 Form 10-K because such financial statements contain material misstatements related to certain out of period adjustments for loan loss reserves; and (2) that it has withdrawn its internal control assessment relating to the Company's financial statements at and for the year ended December 31, 2008 contained in the 2008 Form 10-K due to a material weakness in internal control over financial reporting related to the material misstatements. As a result, KPMG has advised the Company and the Company's Audit Committee orally that these financial statements should no longer be relied upon. In addition, KPMG has advised the Company orally that the financial statements as of and for the three-month period ended March 31, 2009 contained in the Quarterly Report on Form 10-Q filed by the Company on May 8, 2009 should no longer be relied upon and that KPMG was withdrawing its review of such financial statements. As previously reported by the Company, the Audit Committee of the Company determined that the financial statements as of and for the three-month and six-month periods ended June 30, 2009 contained in the Quarterly Report on Form 10-Q filed by the Company on August 10, 2009 should not be relied upon.

## LOSS CAUSATION ALLEGATIONS

75. During the Class Period, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price and operated as a fraud or deceit on purchasers of TierOne common stock by misrepresenting the Company's true financial condition. Once the Defendants' misrepresentations and fraudulent conduct were disclosed or materialized in the market, the TierOne's stock price reacted negatively as the artificial inflation was removed from it through partial disclosures. As a result of their purchases of TierOne common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss.

76. On January 15, 2009, after the market closed, the Company announced that it had entered into The Supervisory Agreement with the OTS (Ex. 2) in connection with the June 2008 examination of the TierOne. The Supervisory Agreement revealed a number of material internal control weaknesses. This adverse information caused the Company's stock to fall on January 16, 2009 from a prior closing price of $3.38 per share to $2.10 per share, a 37.8% decline.

77. The falsity of the 2008 Audit Report on TierOne's financial statements and internal controls rolled over into 2009 -- causing the Company's 2009 financial results and internal controls to be misstated-- as TierOne continued try to conceal its true financial condition.

78. On October 14, 2009, after the market closed, the Company filed an 8-K with the SEC announcing, among other things, that the Company's Provision and ALL for Q2 2009 had to be restated. The announcement states in relevant part:

> In light of the foregoing, on October 13, 2009, the Company's Audit Committee, in consultation with the Company's management and independent registered public accountants, determined that the Company will record an additional loan loss provision of approximately $13.9 million (which includes a total charge-off of approximately $10.6 million) for the three months ended June 30, 2009 to reflect, as directed by the OTS, an adjustment to its allowance for loan losses as of June 30, 2009. As noted in Item 4.02 below, the Company intends to file an amended Form 10-Q for the quarter ended June 30, 2009 (including restated financial statements) as soon as practicable to reflect the effects of the above-referenced charge-offs, loan grading changes and increase in the allowance for loan losses.
>
> The Bank is currently subject to a supervisory agreement that it entered into with the OTS on January 15, 2009. Among other things, the supervisory agreement requires the Bank to maintain enhanced minimum capital requirements in excess of those required of an institution deemed to be "well capitalized" by the OTS. As a result of the above-referenced restatement, the Company expects that the Bank's minimum core capital ratio, as of June 30, 2009, will be adjusted to approximately 8.11%, which is below the elevated ratio of 8.50% required by the supervisory agreement (the regulatory core capital ratio normally required to be deemed "well capitalized" is 5.00%). The Bank's total risk-based capital ratio, as of June 30, 2009, is expected to be adjusted to approximately 10.85%, which is below the 11.00% required by the supervisory agreement (the regulatory total risk-based capital ratio normally required to be deemed "well capitalized" is 10.00%). The Bank's failure to comply

with the supervisory agreement could result in, among other actions, the initiation of additional enforcement actions by the OTS.

As part of the Bank's efforts to maintain enhanced minimum capital requirements pursuant to its supervisory agreement with the OTS, on September 4, 2009, the Company announced that the Company and the Bank had entered into a definitive agreement ("Agreement") to transfer deposits and sell selected loans and other assets associated with 32 of the Bank's branch offices to Great Western Bank, a South Dakota-based subsidiary of National Australia Bank. The Bank believes the consummation of the transactions contemplated by the Agreement, which are subject to, among other conditions, the receipt of regulatory approval, will result in the Bank's capital position exceeding the enhanced OTS minimum capital requirements imposed by the supervisory agreement. There can be no assurances, however, that the Bank will be in compliance with these enhanced minimum capital requirements upon consummation of the transactions contemplated by the Agreement due to unforeseen or intervening events nor can there be any assurance that the Agreement will receive all regulatory and other approvals and the transactions thereunder consummated. The parties to the Agreement are seeking to consummate the transactions contemplated by the Agreement as early as late 2009 but there are no assurances that such schedule will be achieved.

79. This announcement caused the Company's stock to fall from $3.27 per share on October 14, 2009 to $2.98 per share on October 15, 2010, an 8.8% decline. On October 16, 2009, the Company's stock continued to fall and closed at $2.69 per share.

80. On November 10, 2009, the Company filed an 8-K making additional corrections to the Company's Provision and ALL for Q2 2009. This announcement states in relevant part:

Item 2.06. Material Impairments.

TierOne Corporation (the "Company") is the holding company for TierOne Bank (the "Bank"). On a quarterly basis, the Bank is required to file Thrift Financial Reports ("TFRs") with the Office of Thrift Supervision (the "OTS"). The OTS is the Bank's primary regulator. The TFR requires the Bank to report various information, including financial statement and supplemental data regarding the Bank's performance and financial condition for and as of the quarter covered by the TFR.

On November 5, 2009, the Bank filed its TFR for the quarter ended September 30, 2009. The TFR reflected a loan loss provision of approximately $120.2 million (which includes a total charge-off of $109.8 million) for the three months ended September 30, 2009. The loan loss provision and the charge-offs for the third quarter reflect (i) the results of the ongoing OTS examination of the Bank; (ii) the receipt of recent, updated appraisals which show continued deterioration of property values in selected markets; (iii) aggressive

steps undertaken by management to dispose of the Bank's problem assets; and (iv) management's subjective judgment as to continued deterioration in the Bank's loan portfolio resulting from ongoing economic challenges generally and, in particular, challenges in the real estate market.

In a Form 8-K filing dated October 13, 2009, the Company had previously disclosed that it would be restating its financial statements as of and for the three-month and six-month periods ended June 30, 2009. In the Form 8-K filing, the Company reported that it expected an additional loan loss provision of $13.9 million (including a total charge-off of $10.6 million) for the three months ended June 30, 2009. On November 5, 2009, the Bank filed an amended TFR for the quarter ended June 30, 2009 and reported an increase to $17.4 million (including a total charge-off of $14.1 million) in the additional loan loss provision for such quarter. The $3.3 million increase in the additional loan loss provision resulted from the further review of the Bank's loan portfolio that is being undertaken as the Company continues to prepare its restated financial statements for inclusion in an amended Form 10-Q for the quarter ended June 30, 2009.

The Bank is currently subject to a supervisory agreement that it entered into with the OTS on January 15, 2009. Among other things, the supervisory agreement requires the Bank to maintain enhanced minimum capital requirements in excess of those required of an institution deemed to be "well capitalized" by the OTS. As a result of the financial performance reported in the above-referenced TFRs, the Bank's minimum core capital ratio, as of June 30, 2009, was approximately 7.95%, which is below the elevated ratio of 8.50% required by the supervisory agreement (the regulatory core capital ratio normally required to be deemed "well capitalized" is 5.00%). The Bank's total risk-based capital ratio, as of June 30, 2009, was approximately 10.66%, which is below the 11.00% required by the supervisory agreement (the regulatory total risk-based capital ratio normally required to be deemed "well capitalized" is 10.00%). With the additional loan loss provisions discussed above, as of September 30, 2009, the Bank's core capital and total risk-based capital ratios were approximately 4.00% and 6.09%, respectively.

The Bank, as of September 30, 2009, is below both the enhanced capital requirements set forth in the supervisory agreement as well as the ratios normally required to be deemed "well capitalized" by the OTS. The Bank's total risk-based capital ratio of 6.09% as of September 30, 2009 results in the Bank being classified as "undercapitalized." As a result of being undercapitalized as of September 30, 2009, the Bank is required to submit a capital restoration plan and is subject to various additional restrictions provided by the terms of the Prompt Corrective Action regulations. It is possible that the OTS may take additional actions as a result of the Bank's capital status and the ongoing examination of the Bank by the OTS. The Company cannot currently predict what impact it may experience as a result of the actions that may be taken by the OTS.

81. The November 10, 2009 announcement, issued after the market closed, caused the Company's stock to fall on November 11, 2009 from a prior closing price of $1.71 per share to $1.07 per share, or 37.4%.

82. On March 31, 2010, the Company issued a press release announcing that it had entered into a Consent to Issuance of Prompt Corrective Action Directive with the OTS and announced a number of management changes. A The announcement states in relevant part:

> TierOne Bank Executes Consent to Issuance of Prompt Corrective Action Directive with Federal Regulator; Announces Board and Management Changes
>
> Business Wire
>
> LINCOLN, Neb. -- March 31, 2010
>
> TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), announced today that the Bank has executed a Stipulation and Consent to a Prompt Corrective Action Directive ("PCA Directive") with the Office of Thrift Supervision ("OTS"), the Bank's primary federal regulator, setting forth certain required recapitalization mandates and additional business and operational restrictions. The PCA Directive will become effective upon the acceptance of the Consent by the OTS and the issuance of the PCA Directive.
>
> Under the PCA Directive, among other things, the Bank will be required to be recapitalized prior to May 31, 2010, by either merging with or being acquired by another financial institution or by the sale of all or substantially all of the Bank's assets and liabilities to another financial institution. The PCA Directive further requires the Bank to submit a binding merger or acquisition agreement to the OTS by April 30, 2010, unless extended in writing by the OTS.
>
> The Company and the Bank cannot provide assurance that the deadlines and other terms of the PCA Directive can be satisfied. The Bank's consent to the PCA Directive follows the OTS' denial of the Bank's capital restoration plan.
>
> The Company and the Bank also announced today that Charles W. Hoskins has been named acting Chairman of the Board and James A. Laphen has been named President and acting Chief Executive Officer of the Company and the Bank effective immediately. Hoskins, 73, has been serving as the Company's lead director. Laphen, 61, had previously been President and Chief Operating Officer of the Company and the Bank.

> The appointments of Hoskins and Laphen follow the resignation of Michael J. Falbo as Chairman and Chief Executive Officer and as a director of the Company and the Bank. Samuel P. Baird, Gilbert G. Lundstrom, James E. McClurg and James W. Strand also resigned from the Board of Directors of the Company and the Bank. These resignations follow ongoing discussions with the OTS regarding the terms of the PCA Directive, particularly with respect to the deadlines for compliance set forth in the PCA Directive. The directors who resigned did not indicate any disagreement with the Company or the Bank's operations, policies or practices.
>
> Falbo was named Chairman and Chief Executive Officer on January 28, 2010. Lundstrom, who was named Vice Chairman following his retirement as Chairman and Chief Executive Officer in January, has been with TierOne Bank since 1994.
>
> Baird joined the Company's and the Bank's Boards in 2008 and both McClurg and Strand joined the Boards in July 2009.

83. This adverse information caused the Company's stock to fall from $.62 per share to $.32 per share on March 31, 2010, or 48.4%.

84. On May 4, 2010, the Company issued a press release, after the market closed, that the Company received a delisting determination letter from the NASDAQ because the Company had failed to file its overdue quarterly and annual reports with the SEC. The announcement stated that the Company did not plan to appeal the delisting determination and that upon delisting, on May 7, 2010 the Company's stock would trade over the counter on the Pink Sheets. This announcement caused the Company stock to fall to $.29 per share on May 5, 2010 from a prior closing price of $.40 per share, or a 27.5%.

85. On June 4, 2010, the Company filed an 8-K with SEC attaching, among other things, Orders to Cease and Desist separately entered into by the Company and the Bank with the OTS; both of which were entered into pursuant to stipulation. The Bank's Order to Cease and desist identified a number of internal control deficiencies and required the Bank to cease and desist from violating a number of laws and regulations, including but not limited to, regulations "regarding classification of

assets"; "regarding [ALL] and valuation allowances"; "regarding appraisals"; and "regarding loan administration."

86. Later that day, the FDIC issued a press release announcing that the Bank was closed by the OTS, which appointed the FDIC as receiver. In connection with the Bank's closing, Great Western Bank, assumed the Bank's deposits and assets. These events caused the Company's stock to fall from $.16 per share on June 4, 2010 to $.076 per share on June 7, 2010, a more than 50% decline. Shortly thereafter the stock became worthless.

87. On June 24, 2010, the Company filed a Chapter 7 Bankruptcy petition with the District of Nebraska Bankruptcy Court, listing $500,000 to $1 million in assets and $10 million to $50 million in liabilities.

88. On or after July 12, 2011 the OIG issued MLR providing findings about the misconduct at the Bank as detailed throughout this Complaint.

**RELIANCE PRESUMPTION: FRAUD-ON-THE-MARKET DOCTRINE**

89. At all relevant times, the market for TierOne's common stock was an efficient market for the following reasons, among others:

(a) TierOne's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) During the class period, on average, 1.04 million shares of TierOne's common stock were traded on a weekly basis. Approximately 5,8% of TierOne's outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market. Additionally, 8.2% of the float were bought and sold on a weekly basis;

(c) As a regulated issuer, TierOne filed with the SEC periodic reports and was eligible to file a short-form registration statement on Form S-3 with the SEC during the Class Period;

(d) TierOne regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) TierOne was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f) Numerous NASD member firms were active market-makers in TierOne stock at all times during the Class Period; and

(g) Unexpected material news about TierOne was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

90. As a result of the foregoing, the market for TierOne's common stock promptly digested current information regarding TierOne from all publicly available sources and reflected such information in TierOne's stock price. Under these circumstances, all purchasers of TierOne's common stock during the Class Period suffered similar injury through their purchase of TierOne's common stock at artificially inflated prices, and a presumption of reliance applies.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

91. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the

common stock of TierOne during the Class Period and who were damaged thereby. Excluded from the Class are Defendants and TierOne, the current and former officers and directors of KPMG or TierOne, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants or TierOne have or had a controlling interest.

92. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TierOne's common stock was actively traded on the NASDAQ and over-the-counter. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.

93. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

94. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

95. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether the misstatements and omissions alleged herein were made with scienter; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

96. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants

97. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

98. This First Claim is asserted against defendants KPMG, Aesoph and Bennett (collectively "First Claim Defendants").

99. During the Class Period, First Claim Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell TierOne securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, First Claim Defendants, individually and as a group, took the actions set forth herein.

100. First Claim Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of TierOne as specified herein.

101. First Claim Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein by issuing a materially false and misleading audit report of TierOne.

102. Each of the First Claim Defendants' primary liability, and controlling person liability, arises from the following facts: (1) individual First Claim Defendants were high-level executives, directors, and/or agents of KPMG and/or the team engaged in the audit of TierOne ("Audit Team"); (2) each of the First Claim Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of KPMG and/or the Audit Team, was privy to and participated in the creation, development and reporting the audit opinion for TierOne; (3) each of the First Claim Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Audit Team or KPMG's management team, internal reports, and other data and information about the audit of TierOne; (4) each of the First Claim Defendants was aware of the dissemination of KPMG's audit opinion to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) each of the First Claim Defendants culpably participated in the wrongful conduct alleged herein.

103. Each of the First Claim Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such First Claim Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing TierOne's financial condition and future business prospects from the investing public and supporting the artificially inflated or distorted price of its securities. As demonstrated by First Claim Defendants' overstatements and misstatements of the Company's financial condition and business prospects throughout the Class Period, First Claim

Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

104. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for TierOne's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of TierOne's publicly-traded common stock was artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired and/or sold TierOne common stock during the Class Period at artificially high prices and were damaged thereby.

105. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding KPMG's audit opinion of TierOne, which were not disclosed by First Claim Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired TierOne common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

106. By virtue of the foregoing, the First Claim Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

107. As a direct and proximate result of the First Claim Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

108. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchase of common stock giving rise to the cause of action.

**SECOND CLAIM**

**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

109. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

110. This Second Claim is asserted against each of the Individual Defendants.

111. The Individual Defendants acted as controlling persons of KPMG within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the KPMG's operations and/or involvement in the KPMG's audit of TierOne, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of KPMG or its audit of TierOne, including the content of KPMG's audit opinion.

112. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of KPMG or the audit of TierOne and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

113. As set forth above, KPMG violated Section 10(b) and Rule 10b-5. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the

Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

114. This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchase of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: June 17, 2013

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s Phillip Kim

Phillip Kim, Esq. (pro hac vice)
Laurence M. Rosen, Esq. (pro hac vice)
Christopher S. Hinton, #4113213
275 Madison Avenue, 34th Floor
New York, New York 10016

Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com
chinton@rosenlegal.com

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this on the 17th day of June, 2013, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system and the attached service list.

/s/ Phillip Kim